2004 UT 37

**BOARD OF EDUCATION OF JORDAN SCHOOL DISTRICT, Plaintiff and Appellant,**

v.

**SANDY CITY CORPORATION, Defendant and Appellee.**

No. 20020020.

Supreme Court of Utah.

May 4, 2004.

Blake T. Ostler, Bountiful, for plaintiff.

Jody K. Burnett, Salt Lake City, Bryce D. McEuen, Sandy, for defendant.

Stephen C. Earl, Orem, for amicus City of Orem.

Brinton R. Burbidge, Thomas C. Anderson, Salt Lake City, for amicus Utah School Boards Assoc.

Steven W. Allred, Salt Lake City, for amici Salt Lake City Corp. and Utah League of Cities & Towns.

PARRISH, Justice:

¶ 1 In this appeal, we decide whether section 10–9–106 of the Utah Code precludes a municipality from charging school districts a monthly storm sewer drainage fee. The Jordan School District appeals from an order of the district court granting summary judgment in favor of Sandy City on this issue. We affirm the district court's decision.

### FACTUAL BACKGROUND

¶ 2 In 1999, the Sandy City Council adopted Ordinance No. 99–16, establishing a storm sewer drainage utility. The ordinance was adopted pursuant to the city's general welfare powers under Utah Code section 10–8–84 (1999). The purposes and objectives of the ordinance, as listed therein, are to (1) "[p]rovide and maintain an adequate storm sewer drainage system for handling storm water runoff"; (2) "[p]rovide fair, equitable and non-discriminatory rates for using the storm sewer drainage system which user fees will generate sufficient revenues for operating, improving, and maintaining the storm sewer drainage utility adequately"; (3) establish a policy that fees should be set after the consideration of specific factors; and (4) establish standards and guidelines for the discharge of storm water which comply with requirements of the federal Clean Water Act.

¶ 3 The ordinance specifies a method for calculating user rates based largely on the amount of impervious surface on a piece of real property. Monthly fees are collected and managed separately from other city funds. The ordinance provides for a reduction of the monthly fee for non-residential properties having on-site storm water collection facilities approved by the city. In addition, the ordinance establishes an appeals process for non-residential property owners who wish to contest the monthly billing amount assigned to their properties.

¶ 4 Jordan School District ("Jordan") operates a high school and numerous middle and elementary schools within the boundaries of Sandy City. Shortly after the city's adoption of the storm sewer drainage utility ordinance, Jordan filed a declaratory judgment action challenging the city's authority to charge a school district the monthly fees.

¶ 5 Based on their apparent assessment that the case turned only on issues of statutory construction, the parties filed cross-motions for summary judgment on the narrow legal question of "whether the City has authority under Utah Code Ann. § 10–9–106(2) to charge and collect a storm sewer drainage fee for services provided to properties owned by the Jordan School District." Restricting itself to the legal question framed by the parties, the district court held that section 10–9–106(2) did not prohibit Sandy City's collection of such a fee. It accordingly granted Sandy City's motion and denied Jordan's motion. Thereafter, the parties jointly moved to dismiss their remaining claims without prejudice. The district court granted that motion, and this appeal followed.

¶ 6 On appeal, Jordan argues that the district court incorrectly interpreted section 10–9–106. Jordan contends that section 10–9–106 prohibits municipalities from imposing fees on school districts with the exception of those fees specified therein. Because storm sewer drainage fees are not specified, Jordan contends that Sandy City may not impose such fees on Jordan. In response, Sandy City argues that section 10–9–106 applies only to those fees arising from a municipality's land use development regulation and therefore does not prevent a municipality

from collecting service fees associated with the operation and maintenance of a municipality's storm sewer drainage system. Sandy City also relies on section 17A–3–315 of the Utah Code, which specifically recognizes that a municipality may impose charges on governmental entities, including school districts, for services provided by the municipality. Utah Code Ann. § 17A–3–315 (1999). Jordan responds that section 17A–3–315 is irrelevant because the fees at issue should be classified as impact fees, rather than service fees contemplated under section 17A–3–315.

¶ 7 We first address whether section 10–9–106 of the Utah Code precludes the imposition of service fees on a school district. We then turn to the question of whether Sandy City's storm sewer drainage fee may properly be categorized as a service fee.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 8 We review questions of statutory interpretation for correctness, giving no deference to the district court's interpretation. *Parks v. Utah Transit Auth.*, 2002 UT 55, ¶ 4, 53 P.3d 473. Our aim in construing a statute is to give effect to the legislature's intent in light of the purpose the statute was meant to achieve. *In re Marriage of Gonzalez*, 2000 UT 28, ¶ 23, 1 P.3d 1074.

¶ 9 Pursuant to our rules of statutory construction, we look first to the statute's plain language to determine its meaning. *Lovendahl v. Jordan Sch. Dist.*, 2002 UT 130, ¶ 21, 63 P.3d 705. "We read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Miller v. Weaver*, 2003 UT 12, ¶ 17, 66 P.3d 592; *see also Perrine v. Kennecott Mining Corp.*, 911 P.2d 1290, 1292 (Utah 1996) ("[S]tatutory enactments are to be so construed as to render all parts thereof relevant and meaningful." (citation and quotation omitted)); *Bus. Aviation of S.D., Inc. v. Medivest, Inc.*, 882 P.2d 662, 665 (Utah 1994) ("[T]erms of a statute are to be interpreted as a comprehensive whole and not in a piecemeal fashion." (citation and quotation omit-

ted)); *Jerz v. Salt Lake County*, 822 P.2d 770, 773 (Utah 1991) ("It is our duty to construe each act of the legislature so as to give it full force and effect. When a construction of an act will bring it into serious conflict with another act, our duty is to construe the acts to be in harmony and avoid conflicts."). In addition, "[i]t is axiomatic that a statute should be given a reasonable and sensible construction and that the legislature did not intend an absurd or unreasonable result." *State ex rel. Div. of Consumer Prot. v. GAF Corp.*, 760 P.2d 310, 313 (Utah 1988) (citations omitted).

## II. SECTION 10–9–106 DOES NOT PROHIBIT THE IMPOSITION OF SERVICE FEES

■ ¶ 10 Jordan argues that the plain language of section 10–9–106 prohibits Sandy City from imposing a storm drain fee on a school district. Section 10–9–106 provides, in relevant part, as follows:

(1)(a) Each county, municipality, school district, special district, and political subdivision of Utah shall conform to the land use and development ordinances of any municipality when installing, constructing, operating, or otherwise using any area, land, or building situated within that municipality only in a manner or for a purpose that conforms to that municipality's ordinances.

. . . .

(2) A school district is subject to a municipality's land use regulations under this

chapter, except that a municipality may not:

. . .

(c) require a district to pay fees not authorized by this section[.]

Utah Code Ann. § 10–9–106 (2000).

¶ 11 Under Jordan's reading of section 10–9–106, a municipality is not authorized to charge a school district any fee that is not specifically enumerated within the section. Because the section does not mention storm sewer drainage fees,[1] Jordan argues that such fees are prohibited.

¶ 12 Sandy City argues that the interpretation of section 10–9–106 proposed by Jordan ignores both the plain statutory language and the context in which it is found. Sandy City further argues that Jordan's proposed interpretation of section 10–9–106 would bring it into unnecessary conflict with other applicable statutory provisions and would produce an unreasonable and illogical result. We agree with Sandy City.

¶ 13 By its plain language, section 10–9–106 operates to preclude imposition of only those fees arising under land use regulations of chapter 9 of title 10 of the Utah Code. Subsection (2) of section 10–9–106 specifically states that school districts are "subject to a municipality's land use regulations *under this chapter, except* that a municipality may not … require a district to pay fees not authorized by this section." *Id.* § 10–9–106(2), (2)(c) (emphasis added). The commonly accepted usage of the word "except" is to provide a limitation or qualification to the immediately preceding lan-

---

1. Paragraph (2) of section 10–9–106 provides in its entirety as follows:

(2) A school district is subject to a municipality's land use regulations under this chapter, except that a municipality may not:

(a) impose requirements for landscaping, fencing, aesthetic considerations, construction methods or materials, building codes, building use for educational purposes, or the placement or use of temporary classroom facilities on school property;

(b) require a school district to participate in the cost of any roadway or sidewalk not reasonably necessary for the safety of school children and not located on or contiguous to school property, unless the roadway or sidewalk is required to connect an otherwise isolated school site to an existing roadway;

(c) require a district to pay fees not authorized by this section;

(d) provide for inspection of school construction or assess a fee or other charges for inspection, unless the school district is unable to provide for inspection by an inspector, other than the project architect or contractor, who is qualified under criteria established by the state superintendent;

(e) require a school district to pay any impact fee for an improvement project that is not reasonably related to the impact of the project upon the need that the improvement is to address; or

(f) impose regulations upon the location of a project except as necessary to avoid unreasonable risks to health or safety.

Utah Code Ann. § 10–9–106 (2000).

guage. Such a limitation, by its very nature, precludes application of this narrow statutory exception in a land use context to a broader range of general statutory provisions unrelated to municipal land use regulation.

¶ 14 The context of the prohibition against unauthorized fees dictates the same result. We have long recognized that context is an important consideration in statutory interpretation. Because context is important, the "terms of a statute are to be interpreted as a comprehensive whole and not in a piecemeal fashion." *Bus. Aviation of S.D., Inc. v. Medivest, Inc.*, 882 P.2d 662, 665 (Utah 1994) (citations and quotation omitted).

¶ 15 When read in context, the proscription on fees has a fairly limited application. Subsection (c), like the other subsections of paragraph (2), operates as an exception to the general rule that school districts must abide by "a municipality's land use regulations under [chapter 9 of the Utah Code]." Utility service fees of the type at issue here, however, are not properly categorized as fees arising under land use regulations of chapter 9.

¶ 16 Chapter 9, also known as The Municipal Land Use Development and Management Act, is comprised of ten separate parts, each of which deals with land use regulations. Utah Code Ann. §§ 10–9–101 to –1003 (2003). These parts include the Planning Commission (sections 10–9–201 to –205), General Plans (sections 10–9–301 to –307), Zoning (sections 10–9–401 to –409), Residential Facilities for Elderly (sections 10–9–501 to –504), the Board of Adjustment (sections 10–9–701 to –708), and Subdivisions (sections 10–9–801 to –811). Together these parts set up a framework for governing how land is used and developed within a municipality. *See id.* § 10–9–102.[2] Charges for utility services provided by a municipality do not arise from regulations setting conditions of development approval or directing the types of authorized property use.

¶ 17 In addition, none of the subsections surrounding subsection (c) in paragraph 2 of section 10–9–106 expresses an intent to excuse a school district from paying for services or improvements that are directly connected to a need created by the school district. For example, under subsection (b), a municipality generally may not require a school district to participate in the cost of a roadway or sidewalk. It may require participation, however, if the improvement is reasonably necessary for the safety of school children and is located on or contiguous to school property, or if it is needed to connect an otherwise isolated school site to an existing roadway. *Id.* § 10–9–106(2)(b); *see also id.* § 10–9–106(2)(d) (requiring a school district to pay inspection fees when the district cannot provide its own qualified inspector and the city provides one instead); *id.* § 10–9–106(2)(e) (prohibiting the requirement of impact fees in general, but allowing a municipality to require impact fees if the fees are reasonably related to the impact of a school district project).

¶ 18 Not only does the interpretation urged by Jordan conflict with the plain statutory language and the context of section 10–9–106, Jordan's proposed interpretation would create a conflict between section 10–9–106 and section 17A–3–315 of the Utah Code. Section 17A–3–315, which is found in the Utah Code chapter authorizing municipal improvement districts, generally prohibits municipalities from levying assessments against the property of public agencies.[3] Utah Code

2. Section 10–9–102 provides that to accomplish the purposes of chapter 9, municipalities

> may enact all ordinances, resolutions, and rules that they consider necessary for the use and development of land within the municipality, including ordinances, resolutions, and rules governing uses, density, open spaces, structures, buildings, energy efficiency, light and air, air quality, transportation and public or alternative transportation, infrastructure, public facilities, vegetation, and trees and landscaping, unless those ordinances, resolutions, or rules are expressly prohibited by law.

Utah Code Ann. § 10–9–102 (2003).

3. (1) ... [A] municipality may not levy an assessment against property owned by the federal government, the state of Utah, any county, school district, municipality or other political subdivision of the state of Utah or by any department or division of any such public agency even though such property is benefited by improvements made, but each such public agency is authorized to contract with the municipality for the making of such improvement

Ann. § 17A–3–315 (1999). However, it specifically authorizes municipalities to charge public agencies for services. It provides:

Nothing in this section shall prevent a municipality from imposing or a public agency from paying reasonable charges for any services or materials actually rendered or supplied by the municipality to the public agency, including, by way of example and not in limitation, charges for water, lighting, or sewer services.

*Id.* § 17A–3–315(1).

¶ 19 Section 17A–3–315 thus underscores a municipality's power to impose charges or "service fees" for utility-type services provided to a public agency such as a school district. *See V–1 Oil Co. v. State Tax Comm'n,* 942 P.2d 906, 911–12 (Utah 1996) (defining service fees), *vacated on other grounds,* 942 P.2d 915, 918 (Utah 1997). If we were to interpret section 10–9–106 in the manner Jordan advocates, no municipality would be able to charge or collect fees for utility services provided to a school district because section 10–9–106 does not enumerate, and therefore would not authorize, the charging of fees for utility services.

¶ 20 To the extent that Jordan's proposed interpretation of section 10–9–106 conflicts with the legislative intent expressed in section 17A–3–315, Jordan urges this court to rule that the more recently enacted section 10–9–106 impliedly repealed section 17A–3–315. When two statutes relating to the same subject matter unavoidably conflict, the later statute may be viewed as having impliedly repealed inconsistent provisions of the earlier statute. *See Murray City v. Hall,* 663 P.2d 1314, 1318 (Utah 1983); *State v. Sorensen,* 617 P.2d 333, 335–36 (Utah 1980); *Ellis v. Utah State Ret. Bd.,* 757 P.2d 882, 884–85 (Utah Ct.App.1988). "[I]mplied repeals are not favored," however, and we need not find an implied repeal if the apparently inconsistent provisions can be reconciled. *Sorensen,* 617 P.2d at 336. Indeed, we have an obligation to harmonize alleged inconsistencies within and between statutes, avoiding conflicts when possible. *I.M.L. v. State,* 2002 UT 110, ¶ 26, 61 P.3d 1038; *Jerz*

*v. Salt Lake County,* 822 P.2d 770, 773 (Utah 1991); *Stahl v. Utah Transit Auth.,* 618 P.2d 480, 481 (Utah 1980). We therefore reject Jordan's interpretation of section 10–9–106 in favor of an interpretation that allows us to reconcile sections 10–9–106 and 17A–3–315.

¶ 21 Finally, reconciling sections 10–9–106 and 17A–3–315 according to Sandy City's interpretation of section 10–9–106 allows us to avoid an unreasonable result. *See State ex rel. Div. of Consumer Prot. v. GAF Corp.,* 760 P.2d 310, 313 (Utah 1988) ("[I]t is axiomatic that a statute should be given a reasonable and sensible construction and that the legislature did not intend an absurd or unreasonable result." (citations omitted)). Under Jordan's proposed interpretation of the statute, a school district could receive light, sewer, and other utility services and, if provided by a municipal-owned utility, the school district would not have to pay for them, even though it would have to pay for the same services if provided by a non-municipal entity. We do not believe it was the intent of the legislature to create such an unreasonable distinction.

¶ 22 In summary, section 10–9–106 proscribes fees associated with land use regulations of chapter 9. The ability of a municipality to collect service fees, as recognized in section 17A–3–315, stands independent of that proscription. Because we find no conflict between the two statutes, we do not find that section 10–9–106 impliedly repealed a portion of section 17A–3–315.

### III. STORM DRAIN FEES MAY QUALIFY AS SERVICE FEES

¶ 23 Jordan argues in the alternative that the storm sewer drainage fees at issue are not service fees akin to the water, lighting, and sewer fees recognized in section 17A–3–315. Rather, Jordan maintains that the storm sewer drainage fees are properly classified as impact fees prohibited under section 10–9–106(e) and the Impact Fee Act, Utah Code Ann. §§ 11–36–101 to –402 (2000). We reject Jordan's argument in this regard

and for the payment of the cost thereof to the municipality.

Utah Code Ann. § 17A–3–315(1) (1999).

and hold that a storm sewer drainage fee may properly be classified as a service fee.

¶ 24 Our prior cases distinguishing "service fees" from taxes or assessments are instructive. In *V–1 Oil Co. v. State Tax Commission,* we described a service fee as "a specific charge in return for a specific benefit to the one paying the fee." 942 P.2d 906, 911 (Utah 1996), *vacated on other grounds,* 942 P.2d 915, 918 (Utah 1997). We contrasted a service fee with a regulatory fee, which is a specific charge that defrays the government's cost of regulating and monitoring the class of entities paying the fee, and with a tax, which is a "general revenue-raising measure." *Id.* In an earlier case, *Murray City v. Board of Education of Murray City School District,* we determined that a monthly charge imposed for the use of a sewer system constituted a fee for services, not an assessment, and made the following distinction:

> An assessment . . . is imposed upon property within a limited area for an improvement to enhance all property within that area. On the other hand, the cost of a service is determined by the benefits conferred upon the occupants of the land rather than an increase in value to the land itself.

16 Utah 2d 115, 396 P.2d 628, 630 (1964) (citation omitted). Similarly, in *Ponderosa One Limited Partnership v. Salt Lake City Suburban Sanitary District,* we held that charges for use of a sewer system were service charges, not taxes or assessments, because they were "payments for services furnished" and were " 'in the nature of tolls or rents paid for services furnished or available.' " 738 P.2d 635, 637 (Utah 1987) (per curiam) (quoting 11 E. McQuillin, *Municipal Corporations* § 31.30 (3d revised ed.1983)).

¶ 25 Jordan contends that a storm sewer drainage system provides no service or benefit to the school district and therefore any charge associated with the storm sewer system cannot be a service fee. Jordan asserts that service fees for electricity or water involve a school's consumption of a commodity that has been delivered, whereas the handling of storm water runoff does not involve the school's consumption of anything. Jordan also asserts that the school district should not be charged for its use of storm drains because the municipality's storm drain system already exists and will be serviced whether or not it is utilized by the school district.

¶ 26 We find Jordan's position untenable because Jordan does receive a service from Sandy City's storm drain system. The service provided is the acceptance and handling of storm water runoff generated by school district property. This service prevents damage to property from excessive accumulations of water and from flooding. *See City of Littleton v. State,* 855 P.2d 448, 452–53 (Colo.1993) (noting benefits provided by storm sewer drainage systems and ruling that storm sewer charges constituted service fees rather than special assessments). Moreover, Jordan's assertion that the storm drain system will be serviced regardless of whether the school district uses it ignores the fact that the impervious surfaces on school district properties contribute to the need to have and maintain such a system.

¶ 27 It is true that a school district does not "consume" storm water runoff in the same way it consumes water or electricity. Nevertheless, the district consumes storm drain "services." In this respect, we find storm water runoff services comparable to sewer services—both involve the removal of unwanted substances from school district property. The removal of something one does not wish to retain can be as valuable as the delivery of something one wishes to receive. Our cases holding that charges for sewer services constitute service fees validate this principle. *Ponderosa One,* 738 P.2d 635; *Murray City,* 16 Utah 2d 115, 396 P.2d 628. Accordingly, we hold that a storm sewer drainage fee may properly be labeled a service fee and is akin to the water, lighting, and sewer charges mentioned in section 17A–3–315 of the Utah Code. *See City of Littleton,* 855 P.2d at 452–53; *Teter v. Clark County,* 104 Wash.2d 227, 704 P.2d 1171, 1180 (1985) (holding that charges related to control of storm and surface waters did not constitute taxes).

¶ 28 We also disagree with Jordan's contention that the storm drain fee is really an impermissibly charged impact fee. In Jor-

dan's view, the appropriate way for Sandy City to fund its storm drain system is through impact fees charged prior to construction. Jordan asserts that because Sandy City did not require a storm water runoff impact fee at the time the schools were constructed, Sandy City cannot do so now.

¶ 29 By statutory definition, an impact fee is "a payment of money imposed upon development activity as a condition of development approval." Utah Code Ann. § 11–36–102 (2000). We provided a comprehensive discussion of the definition of impact fees in *Salt Lake County v. Board of Education of Granite School District*, where we noted that impact fees "are a species of real estate development exactions" and are generally defined as "charges levied by local governments against new development in order to generate revenue for capital funding necessitated by the new development." 808 P.2d 1056, 1058 (Utah 1991) (citation and quotation omitted).[4]

¶ 30 It may be that Sandy City could have attempted to fund its storm drain system through impact fees. Indeed, Salt Lake County opted for such an approach in the case just cited. *Id.* at 1056 (holding that a storm sewer impact fee was not an assessment). Sandy City argues, however, that its decision regarding the funding of its storm drain system is entitled to deference. It argues that a one-time fee paid only by property owners seeking development approval would not enable it to effectively address its storm water runoff challenges. It contends that creation of a storm sewer drainage utility and the imposition of periodic storm sewer fees are necessary to continuously support a system that must collect and dispose of the city's storm water runoff in a manner that protects property and complies with the federal Clean Water Act.[5]

¶ 31 We hold that Sandy City's decisions regarding the structure, operation, and funding of its storm sewer system are entitled to deference. We generally give latitude to local governments in creating solutions to problems, especially in meeting the challenges and needs caused by accelerated urban growth. *See Price Dev. Co. v. Orem City*, 2000 UT 26, ¶ 19, 995 P.2d 1237; *State v. Hutchinson*, 624 P.2d 1116, 1126 (Utah 1980). Accordingly, we decline to substitute our judgment for that of the Sandy City Council in the resolution of this municipal problem.

¶ 32 Finally, Jordan and amicus curiae Utah School Boards Association argue that the charges in question do not qualify as "fees" because there are serious questions as to whether they are reasonable charges for the services and materials actually provided. The Utah School Boards Association also argues that the "fees" should be classified as impermissible taxes or assessments because they are made primarily for the purpose of constructing capital improvements to the storm drain system. Finally, the Association argues that Sandy City fails to apply the fees evenly to all governmental property, thereby rendering the fees illegitimate.

¶ 33 We decline to address these issues because the sole question preserved by the parties and presented in this appeal is the legal issue of "whether the City has authority under Utah Code Ann. § 10–9–106(2) to charge and collect a storm sewer drainage fee for services provided to properties owned by the Jordan School District." We offer no opinion regarding whether the fee charged by Sandy City is reasonable, whether the manner in which Sandy City allocates funds derived from the fee renders the fee an impermissible tax or assessment, or whether Sandy City fails to apply the charges evenly to all governmental property and whether any such failure renders the fee illegitimate.

---

4. For further "key definitional elements" of impact fees, see *Board of Education of Granite School District*, 808 P.2d at 1058–59.

5. We accepted a similar argument in *Murray City*, 396 P.2d at 630. In that case, the Murray City School Board contested the imposition of a monthly sewer fee, arguing that the fee ought to be viewed as an assessment. We upheld the imposition of the fee, reasoning in part that "[h]igher standards of sanitation have ... resulted in the need for a continuing income for the operation of a sewer system and a single assessment against land served by the facility ... no longer suffices." *Id.*

We also decline the Utah School Boards Association's request to remand this case to the district court for development of a factual record concerning these points. Because the parties voluntarily dismissed the claims giving rise to these issues, they are not before us. To the extent that the validity of Sandy City's charges is dependent on any of these issues, the parties will have to resolve them in subsequent litigation.

## CONCLUSION

¶ 34 In summary, we hold that section 10–9–106 of the Utah Code does not preclude a municipality from imposing service fees on a school district. We further hold that storm sewer drainage fees, akin to sewer fees, may properly be labeled service fees. We do not, however, address whether the fees assessed by Sandy City are otherwise permissible, leaving the resolution of such factually dependent issues to the parties and additional litigation if necessary.

¶ 35 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice NEHRING concur in Justice PARRISH's opinion.